UNITED STATES, Appellee

v

RICHARD H. WALDRON, Sergeant First Class,
U. S. Army, Appellant

15 USCMA 628, 36 CMR 126

No. 18,767

January 28, 1966

Captain John C. Smuck argued the cause for Appellant, Accused. With him on the brief were Colonel Joseph L. Chalk, Lieutenant Colonel Martin S. Drucker, and Captain J. Philip Johnson.

Captain Joseph H. Crosby argued the cause for Appellee, United States.

With him on the brief were *Colonel Joseph J. Crimmins, Lieutenant Colonel Francis M. Cooper,* and *Captain Richard J. Andriolo.*

## Opinion of the Court

QUINN, Chief Judge:

The issue presented by the accused's petition is whether his trial by general court-martial for larceny, and other violations of the Uniform Code of Military Justice, was barred by a previous trial for the same offenses.

Under the Fifth Amendment to the Constitution of the United States and the Uniform Code of Military Justice, no person may be twice put in jeopardy for the same offense. Consequently, if an accused is brought to trial before a court-martial and the proceedings are terminated after jeopardy attaches, but without legal justification, the accused is protected against another trial for the same offenses. *Downum v United States,* 372 US 734, 742, 10 L ed 2d 100, 83 S Ct 1033 (1963); *United States v Schilling,* 7 USCMA 482, 22 CMR 272. The first trial here ended after a Government witness had given part of his testimony; jeopardy, therefore, attached. *United States v Wells,* 9 USCMA 509, 26 CMR 289. However, the trial ended because the law officer directed a mistrial. A second trial does not violate the constitutional protection, if the first trial ended by reason of the proper grant of a mistrial; conversely, if the mistrial was improperly granted, a motion to dismiss is appropriate if the accused is again brought to trial on the same charges. *United States v Stringer,* 5 USCMA 122, 17 CMR 122; *United States v Richard,* 7 USCMA 46, 21 CMR 172. The accused moved to dismiss when arraigned the following day before another court-martial. The motion was denied. Determination of the validity of the ruling requires scrutiny of the circumstances which led to the grant of a mistrial at the first hearing.

During the challenge proceedings at the first trial, defense counsel asked the court members whether they knew Kang Tae Hyong, who was mentioned in three of the four specifications on the charge sheet. No one except the president admitted having any knowledge of Kang. The president said he knew "a Kang," who was "at the orphanage," but he did not know his full name. Defense counsel did not pursue the inquiry; nor did he attempt to establish, by other means, whether the Kang known to the president was the person mentioned in the specifications.

Kang was called as the Government's first witness. After he testified that he had turned over Military Payment Certificates to the accused on two occasions in October 1963, his examination by trial counsel was interrupted by the president. He stated that he and all the court members now associated the witness with a person whose name had figured prominently in a different case, against another accused, which had been tried several weeks earlier. The law officer interpreted the president's remarks as relating "back to the original question asked by the defense counsel" regarding the court members' knowledge of Kang. Accordingly, he ruled that the matter could properly be considered at that stage of the trial as a "challenge for cause." Cautioning against disclosure of such details that "might color the members' positions," he allowed further inquiry into the nature, and the effect, of the information possessed by the court members.

One of the senior court members indicated that, on the basis of the testimony he had heard in the previous case, he had formed an opinion as to the witness. Since the trial, additional information had come to his attention. What he had heard "affected" his ability to believe the witness. The examination of the members continued as follows:

"TC: Has any member of the court formed an opinion as to the witness's credibility? Will the members please raise their hands?

"Let the record reflect that Captain Bosway, Major Alger, Colonel Gruenther, Major Rusche, and Captain Brandt raised their hands when trial counsel asked the question.

"Has that previous conviction, or will that previous conviction render you unable to believe this man today?

"LT COL GRUENTHER: You've already asked me that question. You're not asking me are you?

"TC: I ask everyone on the court.

"MAJOR ALGER: It places some doubt in my mind.

"LT COL GRUENTHER: I've stated, perhaps.

"TC: Sir, I can only challenge all the members for cause.

"LO: Well, as to your last question, you had two responses I think. All except Colonel Barnes, is that right, sir?

"PRES: I wasn't at the last one.

"LO: Now you have heard some discussion, though. I think you indicated that. Has that affected you the same way?

"PRES: Well, I've not heard discussion from the last court, but I've heard this individual discussed by some of the chaplains.

"LO: Does it affect you in the same manner as the others have indicated that it affects them as members of this court?

"PRES: Well, I think the very fact that all of the members of this court have had an opportunity to see what information this witness has produced in the past and raises doubt in all their minds, I'm liable to be affected the same way.

"LO: The question is whether the whole court should be discharged, so to speak, and start with a new court or have one left.

"PRES: I think I'm capable of accepting the testimony and not let the previous information affect my judgment of his credibility."

The trial of a case may be halted, and a mistrial declared, whenever circumstances arise that cast substantial doubt upon the fairness or impartiality of the trial. United States v Johnpier, 12 USCMA 90, 30 CMR 90; United States v Shamlian, 9 USCMA 28, 25 CMR 290; United States v Stringer, supra. Courts have not attempted to mark out definitively the occasions that justify the declaration of a mistrial. Several circumstances have been judicially recognized as appropriate cause. One of these is when the triers of the facts are subject to such bias as not to be impartial. As the Supreme Court of the United States said in Simmons v United States, 142 US 148, 154, 155, 35 L ed 968, 12 S Ct 171 (1891):

"There can be no condition of things in which the necessity for the exercise of this power is more manifest, in order to prevent the defeat of the ends of public justice, than when it is made to appear to the court that, either by reason of facts existing when the jurors were sworn, but not then disclosed or known to the court, or by reason of outside influences brought to bear on the jury pending the trial, the jurors or any of them are subject, to such bias or prejudice as not to stand impartial between the government and the accused. . . .

"Pending the first trial of the present case, there was brought to the notice of the counsel on both sides, and of the court, evidence on oath tending to show that one of the jurors had sworn falsely on his *voir dire* that he had no acquaintance with the defendant; and it was undisputed that a letter, since written and published in the newspapers by the defendant's counsel, commenting upon that evidence, had been read by that juror and by others of the jury. It needs no argument to prove that the judge, upon receiving such information, was fully justified in concluding that such a publication, under the peculiar circumstances attending it, made it impossible for that jury, in considering the case, to act with the independence and freedom on the part of each juror requisite to a

fair trial of the issue between the parties. The judge having come to that conclusion, it was clearly within his authority to order the jury to be discharged, and to put the defendant on trial by another jury; and the defendant was not thereby twice put in jeopardy, within the meaning of the 5th Amendment to the Constitution of the United States."

In the usual case, the bias is directed in favor of, or against, a party to the cause. See United States v Walter, 14 USCMA 142, 33 CMR 354; United States v Smith, 6 USCMA 521, 20 CMR 237. It may be, as the accused implies in his brief, that a predisposition about a party cannot be classed with a predetermined prejudice as to a witness. For purposes of this appeal, we assume that an unalterable pretrial attitude on the part of the triers of the facts toward a particular witness is not ground for declaration of a mistrial in every case. It is certainly arguable that there is no "manifest necessity" to terminate the proceedings if the testimony of the proferred witness would merely be cumulative or relate only to a collateral matter. Cf. United States v Boyd, 7 USCMA 380, 22 CMR 170; United States v Dickenson, 6 USCMA 438, 20 CMR 154. However, if the witness is necessary to a party's case, the situation is more like prejudice toward a party. In that instance, the testimony of the witness may, like the testimony of the party, be determinative of the case. Consequently, prejudgment of such a witness by the triers of the facts is as discrediting to the fairness of the trial, and as obstructive to the ends of justice, as preexisting prejudice for, or against, a party.

As noted earlier, Kang was named in three of the four specifications on which the accused was arraigned.[1] Although he testified only briefly, it was obvious he was an important witness, and his testimony would be material to the issues that would probably be submitted to the court members for determination. The record demonstrated, therefore, that a fixed bias toward him would have the same destructive effect on the fairness of the trial as a preexisting prejudice for, or against, the party presenting him. The question then is whether the court members held a previously formed opinion of Kang which would influence them in their deliberation on the merits of the case. See United States v Deain, 5 USCMA 44, 17 CMR 44.

Five of the six members of the court-martial specifically indicated they had formed a previous opinion as to Kang's credibility. The sixth member, the president, stated he had information about Kang, and he was "liable to be affected the same way" as the others. Previous impressions of a court member are not automatically disqualifying. The member may continue to sit "if it is plainly demonstrated that such impressions will easily yield to the evidence presented in open court and to the law propounded by the trial judge." United States v Deain, supra, page 49. The willingness of all the members to put aside their previously formed opinion of Kang was not "plainly demonstrated."

The president of the court-martial declared he had not actually formed an opinion as to Kang's credibility. He said further that he believed he was "capable of accepting the testimony" and would "not let the previous information affect . . . [his] judgment of . . . [Kang's] credibility." None of the others, however, would go that far. The member next senior to the president said only that he could "[p]erhaps" disregard his previous opinion of Kang. Another member indicated there was "doubt in . . . [his] mind" that he would be uninfluenced by his previous opinion of

---

[1] The dissent contends that, since Kang did not testify as to one offense, there was at least "jeopardy with respect thereto." In military law, all known offenses should be tried together; consequently, the law officer was justified in treating this offense as part of the general issue. See Downum v United States, 372 US 734, 742, 10 L ed 2d 100, 83 S Ct 1033 (1963), dissenting opinion, Mr. Justice Clark.

Kang. The record does not specifically reflect the responses of the remaining three members to trial counsel's question as to whether their previous opinion would "render . . . [them] unable to believe this man [Kang] today." However, without objection by any of them, the president said that the previous knowledge of Kang possessed by the court members "raises doubt in all their minds" that they could assess his credibility on the basis of his trial testimony.

On this evidence, the law officer could reasonably conclude that the opinion of Kang entertained by the █ court members was not casual or transient, but one of "such strength and endurance . . . as to . . . yield only to great persuasion." United States v Deain, supra, page 52. Thus, the law officer was faced with a situation in which five of the six members of the court could not, in the interest of justice, continue to sit on the case. He also had to consider what effect this unanimity of opinion on the part of those who had sat on the other case would have on the remaining member. See United States v Richard, supra. Had only one member of the court been biased against Kang, the problem may perhaps have been solved by excusing him, and instructing the remaining members not to be influenced by his opinion. See United States v Batchelor, 7 USCMA 354, 22 CMR 144. With five of the six members definitely disqualified, and a fair risk apparent that the sixth member might be influenced by their collective opinion, the law officer had good reason to go beyond trial counsel's challenge. The situation was not one of a reduction in the membership of the court below the required number. See Manual for Courts-Martial, United States, 1951, paragraph 41f. It was, as the law officer correctly observed, a "question . . . [of] whether the whole court should be discharged." In United States v Morris, Fed Cas No. 15,815, cited with approval in Simmons v United States, supra, at page 154, the court said: " 'It is an entire mistake to confound this discretionary authority . . . to pro-

tect one part of the tribunal from corruption or prejudice, with the right of challenge allowed to a party.' " In our opinion, therefore, the law officer had a substantial reason to direct a mistrial. Consequently, the defense motion at the second trial to dismiss on the ground of double jeopardy was properly denied.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

The law officer of a general court-martial may not, under the guise of declaring a mistrial, rule finally on challenges of court members, for he is expressly forbidden to do so by Uniform Code of Military Justice, Article 51, 10 USC § 851. I am of the view jeopardy attached in the first trial of this case and that, in consequence, on the second trial, the accused's plea in bar should have been sustained.

Moreover, I believe the record does not sustain the premise of the principal opinion that the members involved were "definitely disqualified," for, though opportunity therefor was presented, no real voir dire was conducted and, at the best, those involved vacillated back and forth on the issue. The whole responsibility for the occurrence also lies with the United States, which should not thereafter be allowed to clean its hands at the expense of the accused. Finally, it should be pointed out that the court's views, on Kang's credibility, even if fixed and unchangeable, could not possibly have affected one specification, to which his testimony did not at all relate. Indeed, he was but one of many Government witnesses. Hence, under any view, the accused was placed in jeopardy with respect thereto. In sum, I believe we too hastily approve the Government's impulsive action here, and that mature reflection on all that occurred will produce the conclusion we do not do justice either to the accused or the United States when we permit the latter to disregard the law in order to get around a supposed impediment to conviction which it has itself caused.

The accused was duly arraigned and tried before a general court-martial convened at Headquarters, 7th Infantry Division, APO 7, U. S. Army, on June 29, 1964, on two charges involving one Kang, as having given or received money orders and Military Payment Certificates to or from the accused, in violation of Code, supra, Article 92, 10 USC § 892, and another, unrelated charge of theft, in violation of Code, supra, Article 121, 10 USC § 921. The prosecution indicated it had neither challenges for cause nor peremptory challenges, but the defense counsel, noting "the name Kang Tae Hyong in several of the specifications," inquired whether any of the members "know him or know of him." The president replied, "I know a Kang. I don't know his full name. He's up at the orphanage." No further inquiries were made by either side, and the defense peremptorily challenged another member.

Following certain motions by the defense which resulted in the dismissal of one specification, Kang Tae Hyong was called as a prosecution witness and hazily testified as to turning over various sums in Military Payment Certificates to the accused and later receiving United States money orders from him, all in violation of certain general orders and regulations, thereby tending to establish accused's guilt of two of the offenses on which he was arraigned.

At this point, the president interrupted the proceedings and announced he would "like to close the court and discuss something with the law officer." The latter, however, quite properly pointed out that such must take place on the record. The president then stated his understanding "that this witness was the same witness at a previous court that all the members of the court sat in on except myself. I was challenged." The following then transpired:

"LO: This is the first time he's been here that I know of.

"COURT MEMBER: I would associate this witness with the man who was key in the Seals case. If so, this perhaps was the question that we had previously if we had seen this gentleman. I would say that he is the same gentleman, however, and I heard additional information about him since then, that case.

"LO: In other words, it goes back to the original question asked by the defense counsel if anyone knew Mr. Kang and the recollection of the court is being refreshed as we go along here. Disclosures have been made. This is a different case as I understand from counsel. This is an entirely separate case from the Seals case, is that not correct?

"TC: Yes, sir. It is an entirely different case dealing with the same general issues.

"LO: They are the same type of offenses?

"TC: The same type of offenses, yes.

"LO: Is there anything different by the defense on the observation of the prosecution? This is not a companion case is it?

"DC: No.

"LO: So this has nothing to do with the Seals case which some members of the court sat on before?

"DC: We'd be interested in what the Colonel has to say.

"LO: Certainly. Now comes the matter of challenge for cause which may be taken up at any time during the progress of the trial. Would the counsel like to ask the member any questions? Colonel Gruenther isn't it?

"LT COL GRUENTHER: Yes, sir.

"LO: Does your prior knowledge affect your ability to sit as a member of the court?

"LT COL GRUENTHER: I would say not. The only thing I've known—

"LO: Well, don't give any details. You're not supposed to give the details because it might color the members' positions.

"You have prior knowledge of this case, is that right?

"LT COL GRUENTHER: I have no prior knowledge of this case.

"LO: I see. Do you have prior knowledge of this witness?

"LT COL GRUENTHER: One fact, only it has not influenced me in my acceptance of his testimony.

"LO: Very well. Are there any further questions by counsel of Colonel Gruenther? It does go back to the question the defense counsel originally asked, if any member knew Mr. Kang. So you may want to go into it further and you may not if you see fit.

"DC: Sir, I've been interested in what he has heard in that there may be a need for an additional witness.

"LO: I see. Well, actually we've gone over the grounds for challenges and the qualifications of the members of the court to sit in judgment. As I understood Colonel Gruenther to say, he said he's heard nothing that has anything to do with the case. Is that right, sir?

"LT COL GRUENTHER: Nothing to do with this case. It was something to do with the witness.

"LO: And this goes back to the original question of the defense whether you knew the witness or not. Is that correct?

"LT COL GRUENTHER: I did not know the witness or his name, but as we began to go into the case I associated the two, and I see a priest come in. Although I didn't realize it before, obviously it's the same person.

"LO: This further disclosure by the member of the court, going back, of course, to the original question asked of the members of the court as to whether they knew Mr. Kang. His name appears in two of the specifications.

"DC: Knew of him!

"LO: Knew of him. Do you have any further questions of the member or of the members of the court?

"DC: Yes, may I ask where you heard this information from?

"LT COL GRUENTHER: From my Catholic chaplain.

"DC: I think, sir, that you have testified that what you've heard will not have any affect [sic] on this case.

"LT COL GRUENTHER: I will state that what I heard does not change my original opinion concerning the witness and in that way it has no effect on the case as far as my acceptance of his testimony.

"DC: I'm satisfied.

"LO: All right.

"TC: Colonel Gruenther, has what you've heard affected this man's credibility on the evidence that we present here today?

"LT COL GRUENTHER: Say your question again, please.

"TC: Has your prior knowledge or prior knowledge that you have, would this affect your ability to believe or disbelieve this man?

"LT COL GRUENTHER: The one bit of information that I have heard since the last court has had little or no comparison to what I heard in the last court. In other words, this witness was the key man in the last court and I think of all his individual background and dealings, and I think this has given me some opinion of this witness and what I've heard since the last court has not changed that opinion, has not influenced me.

"LO: As I recall, this witness did not personally appear before the court in the United States against Seals case.

"LT COL GRUENTHER: This is correct.

"LO: But there was considerable testimony in which he was involved as being an actor or participant.

"TC: Just one further question. Has anything you've heard affected your ability to believe this man?

"LT COL GRUENTHER: Yes.

"TC: Would that affect your be-

635

lieving him today based on the evidence you will see during this trial?

"LT COL GRUENTHER: Perhaps.

"TC: Does any other member of the court feel that way, also?

"LT COL GRUENTHER: And I go back again. I heard this bit of information here, but again, this bit of information is not the key factor in my judgment of his testimony. It's the role that he played in the last court to which each of the—at least all but one member—members of the court were exposed.

"LO: You say you wrote something?

"LT COL GRUENTHER: I wrote something, yes, sir.

"LO: Let's have it marked. It's necessary for it to be on the record. Mark it Appellate Exhibit 8.

"COURT MEMBER (Major Alger): I scratched it out before he started talking.

"LO: That was Appellate Exhibit 8 was it? As I understand it, this was before the other member. What is your name, sir?

"COURT MEMBER: Major Alger.

"PRES: I'd like to say something. It would appear to me that all the members of this court, except myself, have formed an opinion as to the credibility of this witness in the previous case.

"LO: We'll have to develop it, Colonel. You were not here in the other case.

"PRES: But I heard them talking about it.

"LO: I know, but it's counsel's function first. I want to give counsel adequate leeway if that is the case. I didn't mean to cut you off, Colonel. Anything further by counsel?

"TC: The essence of my question and my point is what Colonel Barnes stated. In other words, the members previously have formed a belief about his credibility.

"LO: Ask them the question, and put it on the record, you see? We want it from the members themselves.

"TC: Has any member of the court formed an opinion as to the witness's [sic] credibility? Will the members please raise their hands?

"Let the record reflect that Captain Bosway, Major Alger, Colonel Gruenther, Major Rusche, and Captain Brandt raised their hands when trial counsel asked the question.

"Has that previous conviction, or will that previous conviction render you unable to believe this man today?

"LT COL GRUENTHER: You've already asked me that question. You're not asking me are you?

"TC: I ask everyone on the court.

"MAJOR ALGER: It places some doubt in my mind.

"LT COLONEL GRUENTHER: I've stated, perhaps.

"TC: Sir, I can only challenge all the members for cause.

"LO: Well, as to your last question, you had two responses I think. All except Colonel Barnes, is that right, sir?

"PRES: I wasn't at the last one.

"LO: Now you have heard some discussion, though. I think you indicated that. Has that affected you the same way?

"PRES: Well, I've not heard discussion from the last court, but I've heard this individual discussed by some of the chaplains.

"LO: Does it affect you in the same manner as the others have indicated that it affects them as members of the court?

"PRES: Well, I think the very fact that all of the members of this court have had an opportunity to see what information this witness has produced in the past and raises doubt in all their minds, I'm liable to be affected the same way.

636

"LO: The question is whether the whole court should be discharged, so to speak, and start with a new court or have one left.

"PRES: I think I'm capable of accepting the testimony and not let the previous information affect my judgment of his credibility.

"LO: So do I hear from counsel, then, any motion or challenge or motion for mistrial, or more aptly I might say, challenging the five members. Usually you don't challenge in [sic] bloc on the basis of the prior knowledge affecting them to the point that there's some substantial doubt as to their being able to believe this witness.

"TC: I challenge the entire membership of the court for cause on the basis that they have formed a previous conviction as to this man's credibility.

"LO: Well, then that probably will be known as a motion for mistrial. Is there anything by the defense to say about that motion. Do you join in it?

"DC: No, sir, I don't join in it."

Defense counsel opposed the declaration of a mistrial on the basis the members "can make a fair decision in this case based upon the evidence that they hear." He pointed out that while the Seals case, wherein Kang had been mentioned in stipulated evidence, had been heard by the same members, except for the president, such fact was known to the Government when it referred this case to trial, for it was acted on by the same convening authority with "the same advisers," and both cases involved the same trial counsel. Nevertheless, the law officer declared a mistrial "without prejudice to the Government to bring the case before another court."

On June 30, 1964, the accused was arraigned on the same charges before another general court-martial, on which, however, the same law officer was appointed. He promptly interposed the defense of former jeopardy. The law officer overruled a motion to dismiss, based on such jeopardy.

II

At the outset, it is necessary to place the foregoing matters in a proper frame of reference. True it is that five members indicated they had "formed an opinion as to the witness's [sic] credibility," but there was no *voir dire* of four of them as to the extent and nature of that opinion or its basis in fact. As to the other members, Lieutenant Colonel Grüenther repeatedly indicated that his prior knowledge would only "perhaps" affect the credibility he would accord Kang, and, in fact, declared it "has not influenced me," "has no effect on the case as far as my acceptance of his testimony," and "is not the key factor in my judgment of his testimony." Had he, therefore, been unsuccessfully challenged by the defense, this Court undoubtedly would have found him not to have more than those "Transient or 'light impressions' . . . [which] will not disqualify a juror, if it is plainly demonstrated that such . . . will easily yield to the evidence presented in open court and to the law propounded by the trial judge." United States v Dean, 5 USCMA 44, 49, 17 CMR 44; Reynolds v United States, 98 US 145, 25 L ed 244 (1879). And, concerning the president of the court, surely no challenge can be said to lie, *as a matter of law,* when his constantly reiterated statement was that he had formed no opinion and was "capable of accepting the testimony and not let the previous information affect my judgment of his [Kang's] credibility." Indeed, accepting such to be the case, there was no ground for challenge or, at most, something for the members to determine under appropriate instructions from the law officer. United States v Henderson, 11 USCMA 556, 29 CMR 372; United States v Davis, 12 USCMA 576, 31 CMR 162; United States v Talbott, 12 USCMA 446, 31 CMR 32; United States v Wood, 13 USCMA 217, 32 CMR 217; United States v Czerwonky, 13 USCMA 353, 32 CMR 353.

Thus, the situation is not one involving a hopelessly partisan or biased court. It is only one in which two members were probably not subject to challenge and the balance had formed

**637**

an opinion, the extent and effect of which we are unaware as neither trial counsel—the moving party here—nor the law officer sought to ascertain what the facts were by appropriate *voir dire*. Instead, recourse was immediately had to the extraordinary remedy of a mistrial, without any attempt to invoke the challenging procedure laid down under the Code.

### III

That brings me to the nub of the proposition presented. Under the circumstances here shown, may the law officer terminate a trial in lieu of requiring the prosecution to resort to the normal challenging procedure whereby the membership of the court may be appropriately reduced through a vote thereon, and, if necessary, increased by the convening authority's addition of new members?

First, Congress did not vest the challenging procedure in the law officer. Code, supra, Article 51, 10 USC § 851, expressly provides he "shall rule upon interlocutory questions, *other than challenge*, arising during the proceedings." (Emphasis supplied.) Code, supra, Article 41, 10 USC § 841, declares, "The *court* shall determine the relevancy and validity of challenges for cause, and may not receive a challenge to more than one person at a time." (Emphasis supplied.) We have applied the clear and unambiguous language of these enactments heretofore only in the sense that the court members themselves individually vote on and decide the challenges. United States v Deain, supra; United States v Shaffer, 2 USCMA 75, 6 CMR 75; United States v Stewart, 2 USCMA 78, 6 CMR 78. In *Shaffer*, we said, at page 76:

"This 'ruling' by the law officer denying the challenge for cause constituted a clear violation of the express provisions of the Uniform Code of Military Justice and Manual for Courts-Martial, United States, 1951, to the effect *that the propriety of challenges for cause shall be determined by the court in closed session, by secret written ballot, and in the absence of the law officer and the challenged member.* [Citations omit-

ted.] . . . As such, it falls squarely within the following language used in United States v Lucas (No. 7), 1 USCMA 19, 1 CMR 19, decided November 8, 1951:

'When Congress requires a particular procedure there can be no question but that the court should follow it to the letter. We are thus constrained again to hold that an error of law was committed by the court. . . .' " [Emphasis supplied in part.]

We unanimously held to the same effect in United States v Stewart, supra, where a defense challenge was denied on the basis of facts strikingly similar to the views aired by the president in this case. And if these precedents, which have survived the test of fourteen years of administration of military justice, are to mean anything, they lead inevitably to the conclusion that the law officer here was required to treat the trial counsel's motion as one for individual challenge of the allegedly affected members, cause the latter to vote thereon separately, and, upon the court being reduced to less than five members, order the procurement of new members therefor.

If it be argued that having some of the affected members pass on the qualifications of others alleged to be similarly disqualified is peculiar and untrustworthy, I can only reply that such is the procedure commanded by the Code, which is subject to change by Congress and not by this Court, as indeed, we have recommended. Moreover, there is no basis for presuming the members, having honestly made their own views known, would hesitate to sustain challenges leveled against their fellows, if such had basis in fact. Under the circumstances here presented, I see nothing to indicate they would be so unfair as to deny the Government or the accused their right to a fair and impartial jury, or to cause it to become necessary to resort to the extraordinary remedy of a mistrial to which resort is so seldom made on behalf of the United States.

The appropriate remedy for the Government to pursue in this case being

resort to the challenging procedure, as provided by Congress, was it also open to it to invoke the remedy which the law officer administered? I believe it clearly impermissible to do so, for, to uphold such action, we must find, as in Simmons v United States, *infra,* that every member of the court was, as a matter of law, disqualified to sit in judgment. That is not shown here.

Aside from the positively delineated challenge procedures laid down by Congress, this Court, in discussing mistrials, has, as the principal opinion notes, limited their use to those circumstances which cast substantial doubt upon the fairness or impartiality of a trial. United States v Stringer, 5 USCMA 122, 17 CMR 122; United States v Shamlian, 9 USCMA 28, 25 CMR 290; United States v Johnpier, 12 USCMA 90, 30 CMR 90. But a different and more stringent rule applies when the proceeding is terminated, as here, on the motion of the prosecution. Such a motion may be granted only on the basis of *manifest necessity;* otherwise, jeopardy will attach. United States v Stringer, supra.

Thus, Code, supra, Article 44, 10 USC § 844, forbids another trial when a "proceeding which, after the introduction of evidence but before a finding, is dismissed or terminated by the convening authority or on motion of the prosecution for failure of available evidence or witnesses without any fault of the accused." The intent of Congress in enacting this Article was to prevent the retrial of an accused after discontinuance of an initial prosecution against him on motion of the Government unless "by reason of 'manifest necessity.'" United States v Stringer, supra, at page 129; Hearings before House Armed Services Committee, on H. R. 2498, pages 669–671, 1047. The idea was to give, by statute, to the serviceman, "the rules of former jeopardy developed and applied in the Federal civilian courts." United States v Stringer, supra, at page 129.

Turning to the authorities, it will be found that, from the earliest days, jeopardy was uniformly held to attach in a Federal criminal trial upon discharge of the jury on behalf of the United States unless "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." United States v Perez, 9 Wheat 579 (U. S. 1824). Of the meaning of this limitation, Mr. Justice Story went on to state, at page 580:

"... To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes. ..."

In Simmons v United States, 142 US 148, 35 L ed 968, 12 S Ct 171 (1891), the question of terminating an accused's trial without his consent was again considered by the Supreme Court. There, it appeared that a juror, on *voir dire,* had denied knowing the defendant, but, during the trial, one Ward made affidavit that the juror and the defendant occupied adjoining rooms in a building and were often seen conversing together. When the matter was submitted to defense counsel, he wrote the District Attorney a letter denying Ward's allegations, asserted the defendant and Ward were enemies of long-standing, and informed him he had sent a copy of his letter to the local newspapers. The letter was published and came to the attention of the other jurors. The judge, on motion of the prosecution, declared a mistrial. In upholding the action and finding jeopardy did not attach upon a second trial, Mr. Justice Gray, adverting to the need for finding manifest necessity, said, at page 154:

"... Pending the first trial of the present case, there was brought to the notice of the counsel on both sides, and of the court, *evidence on oath tending to show that one of the jurors had sworn falsely on his voir dire that he had no acquaintance with the defendant; and it was undisputed that a letter, since written and published in the newspapers by the defendant's counsel, commenting upon that evidence, had been read by that juror and by others of the jury.* It needs no argument to prove that the judge, upon receiving such information, was fully justified in concluding

**639**

that such a publication, under the peculiar circumstances attending it, *made it impossible for that jury, in considering the case, to act with the independence and freedom on the part of each juror requisite to a fair trial of the issue between the parties.* The judge having come to that conclusion, it was clearly within his authority to order the jury to be discharged, and to put the defendant on trial by another jury. . . ." [Emphasis supplied.]

And in Logan v United States, 144 US 263, 36 L ed 429, 12 S Ct 617 (1892), the discharge of a jury after its failure to agree, following forty hours of deliberation, was held to make out a case of manifest necessity. Thompson v United States, 155 US 271, 39 L ed 146, 15 S Ct 73 (1894), likewise limits discharge of the jury and termination of the trial to "whenever . . . , taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Id.*, at page 274.

In Wade v Hunter, 336 US 684, 93 L ed 974, 69 S Ct 834 (1949), the Court was faced with the applicability of the same standard to an Army general court-martial, broken off because of a pressing military tactical situation and later retried before another court-martial. In holding jeopardy did not attach, the Court said, at page 690:

"The rule announced in the Perez Case has been the basis for all later decisions of this Court on double jeopardy. It attempts to lay down no rigid formula. Under the rule a trial can be discontinued when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice."

See also Brock v North Carolina, 344 US 424, 97 L ed 456, 73 S Ct 349 (1953).

From these cases, it will be seen the Supreme Court has applied the standard of "manifest necessity" only to the unusual situation, wherein no other remedy was available to the Government, as, for example, in the case of a corrupted juror whom the defendant has advertised to all his fellows by publication of the controversy: Simmons v United States, supra; or in the instance of a jury discharged only after long and arduous deliberations: Logan v United States, supra; or a court-martial affected by a rapidly changing combat situation: Wade v Hunter, supra. Never, however, has it extended the exceptional character of this extraordinary procedure to the usual challenging process, nor has any authority for such action been brought to our attention.

Rather, there was shown here no manifest need for the law officer's action. He, unlike the situation in many civil courts which do not permit replacement of a juror, had available to him a most liberal challenging procedure, even though the trial had begun on the merits. By its invocation, or, indeed, resort to the erroneous, shorthand procedure of ruling subject to objection by any member of the court, see United States v Shaffer, supra, he could have removed offending members and directed new members to be obtained by the trial counsel. In this manner, those who were not fairly subject to challenge would have continued in the trial, along with any required new members, and both the accused and the Government would have received the sort of hearing contemplated by the Uniform Code. Such procedure being readily available to him, there was no need, in defiance of the Code, to ignore it and resort to the declaration of a mistrial. Hence, I can find no manifest necessity present here, which prevents the attachment of jeopardy.

Moreover, I point out that the fault for the problem here presented lies not with the accused but with the Government. It had, under military practice, complete control over the case and referred it to trial before a court-martial which it knew had heard the stipulated references to Kang in the earlier Seals case. The trial counsel had prosecuted the earlier case, yet, when the defense inquired whether any member knew Kang, and only the president responded, the Government's representative remained conspicuously silent. It was only after he discovered the court's at-

titude was possibly against him that he, fearful for his cause, sought to have it discharged. And, "It is uniformly held that, in the absence of sufficient evidence to convict, the district attorney cannot by any act of his deprive the defendant of the benefit of the constitutional provision prohibiting a person from being twice put in jeopardy for the same offense." Cornero v United States, 48 F2d 69, 71 (CA 9th Cir) (1931). So also should the action of the Government here, bringing on the situation before us, prevent it from availing itself of a plea of manifest necessity in order to uphold public justice.

Finally, I advert to the fact Kang's testimony related only to two of the specifications before the court-martial.

The third involved an alleged theft of monies from a company fund which was in no way involved with accused's other transgressions. Giving credence to everything which has been said here on behalf of the Government, the court members' opinions extended only to Kang's credibility and no further. At the least, then, accused was entitled to have his trial proceed on that count before the court and the termination of the trial placed him in jeopardy thereon. United States v Stringer, supra; Code, supra, Article 44. As such, the findings of guilty as to it are barred in law and should be set aside.

I, however, would set aside all the findings of guilty and order the charges dismissed.